UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                       Case No. 07-20400
                                                      Honorable Julian Abele Cook, Jr.

BRUCE WENDEL,

        Defendant.

ORDER

On June 28, 2011, the Court conducted and completed an evidentiary hearing in an effort to determine the total accuracy of the Presentence Investigation Report that had been prepared by its Probation Department for use prior to the imposition of the sentence upon the Defendant, Bruce Wendel.  Following the conclusion of this evidentiary hearing and based upon the statements of the witnesses, the Court submits the following summary of facts and conclusions upon which it will rely in the sentencing of Wendel in this criminal case.

I

Procedural History

On August 15, 2007, Wendel was charged in an indictment by a grand jury with two counts of conspiring to commit an assault upon another person with a dangerous weapon, 18 U.S.C. § 1959(a)(6), as well as two counts of committing an assault upon another person with a deadly weapon which resulted in a serious bodily injury, 18 U.S.C. §§ 1959(a)(3), 2(a).  Acting upon the provisions within Fed. R. Crim. P. 11, he entered a plea of guilty on June 8, 2009 to one count of having committed a violent crime (i.e., assault with a dangerous weapon) in aid of racketeering.

1

On August 3, 2010 and immediately prior to his sentencing, Wendel made an oral request to have his Presentence Investigation Report ("PIR") modified. It was his contention that the PIR was inaccurate, in that it incorrectly reported in paragraphs 18 and 19 that he had (1) been at the Mid City Bar ("Bar") in Fort Wayne, Indiana on December 31, 2005 and January 1, 2006) and (2) assaulted Donald Bunn with such a viciousness that the victim was left on the floor of the Bar in a state of unconsciousness. The Government, through its counsel, concurred with Wendel's account, and, in so doing, agreed to the proposed redaction of paragraphs 18 and 19 of the PIR. Based on the joint agreement by the parties regarding the claimed inaccuracies, the Court granted Wendel's request and ordered the two paragraphs to be removed from the PIR. The paragraphs, which were the subject of Wendel's oral motion, read as follows:

> 18. On or about January 1, 200[6], Bunn and a friend were at the Mid City Bar and Grill, Fort Wayne, Indiana. After calling for a ride, Bunn was standing at the bar waiting to pay his tab when he was approached by Ramon Rios, BRUCE WENDEL, Leroy Frasier and William Elston. They were wearing hooded sweatshirts with the hoods pulled up and some were wearing sap gloves. Sap gloves are leather gloves with lead inside the fingers. Members of the Outlaw Motorcycle Club used them because they caused serious damage and did not leave marks.
>
> 19. Bunn recognized BRUCE WENDEL at the forefront of the group. WENDEL punched Bunn several times with his right hand. Others in the group also punched Bunn until he fell to the floor. WENDEL then stomped Bunn in the head and torso area. Bunn was unconscious and offered no resistance. Following the assault, Bunn was bleeding from his nose, mouth and head. Emergency Medical units responded, noting Bunn was critical. He was in cardiac arrest and had to be revived. Bunn was hospitalized as a result of the injuries which included severe bruising to the lungs, head, face, ears and fractured ribs.

(PIR at 9).

Immediately prior to the next sentencing date, the Court was advised by a supervising probation officer in Detroit that he had been informed by the government agent in charge of this

case that Wendel's earlier representations were incorrect.

On August 19, 2010, the Court - with recognition of the two conflicting statements - vacated its oral directive of August 3rd and reinstated paragraphs 18 and 19 of the PIR pending its receipt of reliable information that would assist it in making an assessment of the accuracy, if any, of the relevant paragraphs within the PIR.

After a series of adjournments, the Court conducted an evidentiary hearing on June 28, 2011 wherein the Government and Wendel were given opportunities to submit evidence that would support their respective positions. In the following paragraphs II and III, the Court will summarize the evidence that was proffered by the parties during the evidentiary hearing.

II

The Government produced one witness for live testimony, and the deposition testimonies of two other witnesses plus one documentary item.

(1) <u>William Jason Elston</u>

Elston, who is a co-defendant in this case, acknowledged his membership in the Outlaws Motorcycle Club ("Outlaws") during all of the times that are relevant to this hearing. According to Elston, he drove other co-defendants in this case (Ramon Rios, Bruce Wendel and Leroy Frasier) from the Outlaws' clubhouse to the Bar on December 31, 2005 where they would collectively "deal with" Bunn. Upon their arrival, Elston remained in the car while his passengers entered the Bar and emerged five to ten minutes later.[1] Despite not being a witness to any of the events that allegedly followed, Elston had "no doubt" that Wendel was present in the Bar on New Year's Eve.

---

[1] Elston, in pointing to his black eye that would ostensibly make him easily identifiable to Bunn or anyone else who may later seek to identify him, remained in the car.

Elston, while relying upon his Fifth Amendment right against self-incrimination, asserted that there were two aspects of paragraph 18 in the PIR which were - in his opinion - incorrect. First, he reiterated his earlier stance; namely, that he was never in the Bar during Wendel's alleged altercation with Bunn. Second, it was Elston's belief that, to the best of his knowledge and memory, none of the passengers (Rios, Wendel and Frasier) wore lead-lined gloves and they collectively entered the Bar.[2]

(2) <u>Darrick M. Engelman</u> (Deposition)

To further buttress its case, the Government proffered the deposition testimony (dated August 7, 2006) of this Fort Wayne, Indiana police officer.[3] Engelman, who knew Bunn as an old acquaintance, arrived at the Bar with his date around 1:00 a.m. on New Year's Day. Shortly thereafter, he saw seven or eight men, including Wendel,[4] enter the Bar wearing large "hockey player" type gloves. He saw Wendel punch Bunn in the face with his right hand while wearing a black glove, knock him to the floor and thereafter - with the aid of others - repeatedly punch and kick him in the head. Engelman indicated that this altercation ended when all of the assailants ran out of the Bar, leaving Bunn on the floor. Thereafter, Engelman - believing that Bunn was now in a state wherein he was unable to breathe - attempted to administer some form of a life saving

---

[2]Elston opined that his passengers' gloves should have been more properly characterized as gardening gloves.

[3]His deposition, along with several others, was given in connection with the State of Indiana's investigation into whether to pursue criminal charges against Wendel for his alleged participation in the Bunn incident.

[4]Engelman, in his job as a police officer, recognized Wendel as a tow-truck operator with whom he came in contact frequently. While being unable to specifically identify any of the attendees at the Bar as members of the Outlaws, it was his belief that Elston was one of Bunn's assailants.

measure (e.g., cardiopulmonary resuscitation).

(3) <u>Donald Bunn</u> (Deposition)

Donald Bunn, in a deposition (dated August 7, 2006), noted that he was familiar with Wendel as the result of having "seen him around" at bars, bike rallies, and bike shows. On the night of the incident, Bunn - in acknowledging that he had been drinking heavily[5] - knew he was not in any condition to drive a motor vehicle. According to Bunn, he was in the process of paying his bar tab when he saw Wendel walk into the Bar with several other men. He - while not recalling many of the events thereafter - remembers laying on the floor and hearing Engelman's voice of assurance. When questioned, Bunn - while unable to remember the details of the incident with any exactness - did not recognize any other persons from the group of men who had entered the Bar with Wendel.

(4) <u>Rocky A. Reinhard</u> (Supplementary Offense Report)

The Government submitted this document from the Fort Wayne, Indiana Department of Police which reflected the recollections of a witness, Rocky A. Reinhard, who had been working as a bartender at the Bar when Bunn was assaulted. Reinhard opined that Bunn was struck once by a "big Harley-looking dude all dressed in black" who wore black leather gloves. According to Reinhard, Bunn - after being struck - went down to the floor when an assailant "got on top of" him and repeatedly struck him. Reinhard said that, when he went around the bar counter in an effort to give aid and comfort to Bunn on the floor, the assailant chased him back behind the bar along with a stern warning, "you're lucky, I almost killed you."  (Gov. Exh. 9, Supp. Off. Report).

When presented with a photographic array of suspects by the local police, Reinhard selected

---

[5]His blood alcohol content was recorded by the local police at .19.

the man in photograph #2, which, according to the officers, was a picture of Wendel. However, Reinhardt acknowledged that he could not state with total confidence that he was right about his selection.

III.

In support of his position, the Defendant, Bruce Wendel, proffered three live witnesses, and two deposition witnesses, in addition to several other documents.

(1) <u>Anthony F. Ankenbrandt</u>

Ankenbrandt, who is in his mid-seventies, knew of Wendel through his affiliation with motorcycle clubs within the region. He was present at the Outlaws' New Year's Eve Party on December 31, 2005, having arrived between 9:00 p.m. and 9:30 p.m. Contending that he did not leave the party until nearly 3:00 a.m on the following day, Ankenbrandt claims that Wendel was present with or near him especially between the hours of 1:00 a.m. and 3:00 a.m. According to him, the band - after it had stopped playing music - was paid by Wendel who had purchased some drinks for them. Thereafter, Ankenbrandt noted that he and Wendel helped some of the band members to remove their musical equipment from the Bar.

(2) <u>John Melton</u>

Melton, a high school classmate of Wendel, was a member of the Black Pistons, who generally rode his bike and traveled with the Outlaws. After extensive questioning during the evidentiary hearing, however, it was clear to the Court that he did not have any independent recollection of the events of December 31, 2005 or of the following day.

(3) <u>George Russell</u>

Russell, who described himself as a former competitor of Wendel in the Fort Wayne,

Indiana towing business, testified that on the "night" of New Year Eve's party at the Bar, he had given free rides to patrons who, for a variety of reasons, required assistance in meeting their transportation needs. Russell, who claims to have been present at the Bar for much of the party, says that he - despite having only witnessed the tail-end of the incident with Bunn - did not see Wendel among the assailants or any of the other persons who were escorted from the Bar by the security guards.

(3) David E. Hall (Deposition)

In his deposition on August 14, 2006, Hall testified that he had worked as a singer and guitarist for the band during the party at the Outlaws' New Year's Eve Party. Although the scheduled playing time of the band was from 9:00 p.m. until 1:00 a.m., the musicians continued to perform for about forty (40) minutes beyond 1:00 a.m. He recalled having seen Wendel around midnight when champagne toasts were made. But the next time that he saw Wendel was around 1:40 a.m when they spoke directly about the payment to the band for its services, the prospects for future work as a musical group, and the need by its members for help in "breaking down" their equipment.

(4) Edward Fulk (Deposition)

Fulk says that he and several of his fellow members of the Outlaws provided security at the New Year's Eve party on a rotating schedule. According to Fulk, he, having worked on a one-hour shift in the parking lot which began at 1:00 a.m., did not see anyone leave the Bar during his "work shift" at that time. Furthermore, Fulk noted that, after being asked by Wendel to come inside the premises at 2:00 a.m., he accommodated him by helping to end the party. At that time, he observed Wendel taking care of the band (i.e., payment of money for its services, etc.). Over the next few

hours until around 5:00 a.m., he saw Wendel off and on during the night.

(5) <u>Miscellaneous Documents</u>

Wendel also submitted several documents which, in his opinion, were relevant to the issues in this hearing; namely, (1) a supplementary police report from the Fort Wayne Indiana Police Department which indicated that Darrick M. Engelman had identified William Elston as being one of Bunn's assailants, (2) a motion by a prosecutor for the State of Indiana who sought authority from the Allen Superior Court in Indiana to dismiss the then-pending criminal charges against Wendel, and (3) an order of dismissal by the above-listed state court.

IV.

The Court has a responsibility to determine the accuracy of the information that appears in every resentence investigation report. The task here is governed by Rule 32 (i)(3) of the Federal Rules of Criminal Procedure, which specifies that a court has three options when it is presented with an objection by a defendant; namely,

> "At sentencing, the court:
>
> (A) may accept any undisputed portion of the presentence report as a finding of fact;
>
> (B) must - for any disputed portion of the presentence report or other controverted matter - rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing; and
>
> (C) must append a copy of the court's determinations under this rule to any copy of the presentence report made available to the Bureau of Prisons."

According to the Sixth Circuit, once the matter involving a disputed claim or an issue is called to the attention of the court, it must affirmatively rule on the controverted matter where it could potentially impact the defendant's sentence. *U.S. v. White,* 492 F.3d 380, 415 (6th Cir. 2007).

Thus, if a court intends to rely on the facts revealed during an evidentiary hearing in fashioning the defendant's sentence, it must first find that there is evidence which supports those facts or conduct by a "preponderance of the evidence" standard. According to the Supreme Court, this simply means that the court - after sitting as the trier of fact - "believe[s] that the existence of a fact is more probable than its nonexistence . . . ." *In re Winship,* 397 U.S. 358, 371-72 (1970); *See also,* BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "preponderance of the evidence" as "[t]he greater weight of the evidence, not necessarily established by the greater number of witnesses testifying to a fact but by evidence that has the most convincing force; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other."). Under these circumstances, the Government ultimately bears the burden of proof.[6] *U.S. v. Jackson*, 990 F.2d 251, 253 (6th Cir. 1993).

Upon evaluating the evidence that was produced during this evidentiary hearing and, when coupled with the existing record, the Court concludes that - more likely than not - Wendel was present at the Mid City Grill in Fort Wayne, Indiana and played a role in the January 1, 2006 assault upon Bunn. Therefore, the information contained in paragraphs seventeen and eighteen will remain in the report, with only minor modifications as noted below.

As to paragraph eighteen, all of the statements within the PIR therein are supported by a preponderance of the evidence, with the exception of the following statements; to wit, (1) Elston was present inside the Bar during all of the times that are relevant to the hearing, and (2) the men,

---

[6]The Sixth Circuit requires literal compliance with the rule for purposes of enhancing the accuracy of the sentence and the clarity of the record. *White, supra* at 415.

who were among the assailants of Bunn, wore hooded sweatshirts and sap gloves. The balance of the information within this paragraph of the PIR will remain without any further modification.

      The Court bases its conclusions on several pieces of evidence. Of most relevance is the testimony from William Elston, whom the Court believes to have been the most credible witness who was proffered by either party during this evidentiary hearing. Elston testified unequivocally that he drove Wendel and two other members of the Outlaws (Rios and Frasier) to the Bar during the evening of December 31, 2005 so that they could "deal with" Bunn because of a prior altercation with him. He also indicated that Wendel, Rios, and Frasier went inside the Bar where they remained for approximately five to ten minutes, and thereafter returned to his car where he had awaited their return.[7] Elston, who had "no doubt" that Wendel was present during this brief period of time, said that the occupants in his car remarked collectively after returning from the Bar that Bunn got "beat up" badly during the incident. Although Elston's testimony establishes that he was not an eye witness to the altercation, the Court notes that his comments significantly undercut Wendel's claim that he had a plausible alibi for not being associated with Bunn's injuries. If Elston is to be believed, there is absolutely no truth to Wendel's claim that he was not present at the Bar when Bunn was seriously injured. Indeed, the only credible evidence which tended to substantiate Wendel's version of events came from the testimonies of Ankenbrandt, Fulk, and Hall, all of whom claimed to have been with Wendel during the relevant time period. Nevertheless, the Court finds it implausible that any - or all - of these witnesses can accurately account for Wendel's whereabouts for every moment during the early morning hours of January 1, 2006 when the conflict was said to have occurred. In essence, the Court does not - and did not - find the testimonies of these three witnesses to be credible

---

     [7]The Court accepts this portion of Elston's testimony as true.

in terms of establishing an alibi.

Moreover, as far as the Court can determine, Elston - as a fellow member of the Outlaws - had no incentive to offer a recitation of facts that would conflict directly with Wendel's alibi defense. To do so would only place Elston at odds with Wendel, which could have had an adverse impact on his own self-interests. Elston's demeanor during the hearing also suggested that he was generally reluctant to testify, partially out of a concern for incriminating himself. Taken together, these facts bolstered Elston's credibility, especially in comparison to the other witnesses.

That being said, the Court also believes that there were portions of Elston's testimony which undercut the statements within the PIR, which states that Bunn's assailants wore lead-lined sap gloves at the time of the assault. When asked about the accuracy of that information, Elston testified that the gloves were thought by him to be gardening gloves. Inasmuch as the Government did not present any live witnesses, deposition testimony, or documentary evidence to support or challenge that aspect of its claim, the Court will exercise its discretionary authority to strike that particular aspect of paragraph eighteen from the PIR. The same is true as to the representations in the paragraph that (1) Elston was inside the premises of the Bar during the fight, and (2) Bunn's assailants wore black hooded sweatshirts.

By contrast, the Court finds it is more likely than not that Wendel played an actual role in assaulting Bunn. This fact was established by deposition testimony from Darrick M. Engelman who asserted that Wendel had entered the Bar, punched Bunn in the face with his right hand, kicked him in the head and continued to punch him after he had fallen to the floor. This testimony was corroborated by (1) Bunn who, while being unable to recall any details from the fight, knew that Wendel entered the establishment with the group of his eventual assailants, and (2) the police report

11

which summarizes Reinhard's statement which - though not considered as substantive evidence - significantly undercut the remarks by Russell that Wendel may not have been present inside of the Bar.  In light of this evidence, the Court believes that the information in paragraph nineteen which describes Wendel's role in the fight has been substantiated by a preponderance of the evidence standard.

However, none of the information presented by the Government substantiated the extent of Bunn's injuries; namely, whether he (1) was bleeding from his nose, mouth and head upon the arrival of the emergency medical crew to the Bar, (2) was in cardiac arrest when treated by the emergency medical crew, and (3) sustained injuries which included the bruising and fractures as indicated.  Those aspects of the report will thus be stricken.

In summary, when based upon the foregoing findings, paragraphs eighteen and nineteen of the presentence investigation report shall now be modified and read as follows:

18. On or about January 1, 200[6], Bunn and a friend were at the Mid City Bar and Grill, Fort Wayne, Indiana.  After calling for a ride, Bunn was standing at the bar waiting to pay his tab when he was approached by Ramon Rios, BRUCE WENDEL, and Leroy Frasier.

19. Bunn recognized BRUCE WENDEL at the forefront of the group.  WENDEL punched Bunn several times with his right hand.  Others in the group also punched Bunn until he fell to the floor.  WENDEL then stomped Bunn in the head and torso area.  Bunn was unconscious and offered no resistance.  Bunn was hospitalized as a result of [his] injuries.

Finally, the Clerk of the Court shall attach a copy of this order to the PIR which shall be made available to the Bureau of Prisons, if necessary and upon request.

Finally, no further adjournments of the sentencing date will be granted except under extreme circumstances.

IT IS SO ORDERED.

Date: September 1, 2011                                              s/Julian Abele Cook, Jr.
                                                                     JULIAN ABELE COOK, JR.
                                                                     U.S. District Court Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on September 1, 2011.

                                                                     s/ Kay Doaks
                                                                     Case Manager